**Christopher SANDERS and Mary Ann Sanders, Appellants,**

v.

**Steven HEROLD and Beth Ann Herold, Appellees.**

No. 01–04–00709–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 29, 2006.

Rehearing Overruled Sept. 15, 2006.

Darrin M. Walker, Law Offices of Darrin Walker, Kingwood, George Chandler, Chadler Law Offices, Lufkin, and W. Perry Zivley, Houston, TX, for Appellant.

Craig H. Clendenin, The Ballard Law Firm, Houston, and Kathleen Marie Kennedy, Benckenstein, Norvell & Nathan, L.L.P., Beaumont, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

SHERRY RADACK, Chief Justice.

This is an appeal from a summary judgment rendered in favor of appellees, Steven and Beth Ann Herold ("the Herolds"). Appellants, Christopher and Mary Ann Sanders ("the Sanderses"), filed a negligence suit for damages arising out of the molestation of the Sanderses' youngest daughter, J.S. by the Herolds' teenaged son, Michael. The Herolds filed a traditional motion for summary judgment, which the trial court granted. In three issues, the Sanderses contend that (1) one could reasonably infer from the evidence that the Herolds knew or should have known of their son's dangerous propensities, so as to impose a duty upon them to protect J.S. from the sexual assault perpetrated upon her; (2) they presented sufficient evidence from which people could reasonably infer that the Herolds' conduct demonstrated a conscious indifference to an extreme risk, so as to defeat the Herolds' motion for summary judgment on their gross negligence claim; and (3) the trial court erred in granting summary judgment. We affirm.

## BACKGROUND

On November 24, 2001, the Sanderses invited the Herolds and two of their children, Michael and Karen, to their home for dinner, as they had done on numerous other occasions. After dinner, while their parents remained downstairs, Michael Herold and the Sanderses' three children, including J.S., went upstairs. At the time, Michael was sixteen years old and J.S. was seven years old. Karen Herold, the younger of Michael's two older sisters, later went upstairs and discovered J.S. and Michael in J.S.'s room with the door locked. Karen went downstairs to report that something was wrong between Michael and J.S. After the parents separated J.S. and Michael, the Sanderses believed that something sexually inappropriate had occurred. The Herolds took Michael and went home, where Michael told his father what he had done. In the meantime, the Sanderses called the police and asked Mr. Herold to bring Michael back to the Sanderses' house. Michael admitted that he had been sexually abusing J.S. for some time. That night, the police took Michael

to a juvenile detention facility. Michael later pleaded guilty to sexual assault. Before the Sanderses took J.S. to Texas Children's Hospital for a rape kit, Mrs. Herold revealed to Mrs. Sanders for the first time that Melinda Herold Morris, their oldest daughter, had been sexually assaulted as a child. The next day, November 25, Melinda told her parents that she had sexually abused her brother Michael when he was a child. The Herolds, in turn, revealed this to the Sanderses.

The Sanderses alleged that the Herolds were negligent and grossly negligent. The negligence claims against the Herolds specifically addressed the Herolds' (1) failure to act as reasonable and prudent parents would act in seeking counseling or other medical help for their children, Michael and Melinda, (2) failure to supervise their children, Michael and Melinda, and (3) failure to warn third parties of the anticipated dangers associated with permitting Michael and Melinda to have unsupervised access to the Sanderses' children. In the following paragraph, the petition also alleged that the Herolds had a duty to warn the Sanderses that their children had been molested.

> If the Herolds had advised the Sanders [sic] about Melinda's history of abuse, suicidal tendencies, and incomplete therapy, the Sanders [sic] would more fully have appreciated the significance of the Herolds' cavalier behavior toward their children with respect to sexual matters and the sexually oriented behavior of Michael Herold and would not have allowed any of the Herold children to be alone with any of their children.

The Herolds moved for summary judgment on the ground that they owed no duty to the Sanderses or J.S. The trial court granted the Herolds' traditional motion for summary judgment without stating any grounds.

## STANDARD OF REVIEW

■ In reviewing a summary judgment, an appellate court must consider whether the successful movant at the trial level carried its burden of showing that there was no genuine issue of material fact and that judgment should be rendered as a matter of law. TEX.R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999). We assume all of the nonmovant's evidence is true and indulge every reasonable inference in favor of the nonmovant. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if it conclusively establishes all elements of an affirmative defense as a matter of law. *Randall's Food Mkts., Inc., v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995).

## PARENTAL DUTY

In issues one and three, the Sanderses contend that the trial court erred in granting summary judgment for the Herolds because the Herolds did not conclusively negate the duty element of the Sanderses' negligence cause of action. Specifically, the Sanderses argue that they provided enough evidence to raise a genuine issue of material fact on the existence of a parental duty.

### 1. *How does the Court Determine Duty in a Summary Judgment Proceeding?*

■ Whether to impose a duty under certain circumstances is a question of law. *See Walker v. Harris*, 924 S.W.2d 375, 377 (Tex.1996). However, this legal question is decided based on the particular facts of the case. *See Redinger v. Living, Inc.*,

689 S.W.2d 415, 418 (Tex.1985). If the facts are disputed, and one version of the facts would support the imposition of a duty, summary judgment is improper. *See Mitchell v. Missouri–Kansas, Texas R.R. Co.,* 786 S.W.2d 659, 662 (Tex.1990). "The existence of duty is a question of law when all of the essential facts are undisputed, but when the evidence does not conclusively establish the pertinent facts or the reasonable inferences to be drawn therefrom, the question becomes one of fact for the jury." *Id.* (quoting *Bennett v. Span Indus., Inc.,* 628 S.W.2d 470, 474 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.)). Thus, in a summary judgment proceeding, if the nonmovant's version of the facts would support the imposition of a legal duty, summary judgment for the defendant based on a claim of no duty is inappropriate.

### 2. When is a Parental Duty Imposed?

▮ "The mere fact of paternity or maternity does not make a parent liable to third parties for the torts of his or her minor child." *Rodriguez v. Spencer,* 902 S.W.2d 37, 42 (Tex.App.-Houston [1st Dist.] 1995, no writ). As a general rule, minors are liable for their own torts. *Id.* (citing *Williams v. Lavender,* 797 S.W.2d 410, 412 (Tex.App.-Fort Worth 1990, writ denied)). A parent may be held vicariously liable for his minor's torts under the theories of respondeat superior or joint enterprise. *Rodriguez,* 902 S.W.2d at 42; *see de Anda v. Blake,* 562 S.W.2d 497, 499 (Tex.Civ.App.-San Antonio 1978, no writ). Additionally, a parent may be held directly liable for his minor's torts if he permits the minor to act in a manner likely to cause injury to another. *Id.* at 42; *Moody v. Clark,* 266 S.W.2d 907, 912 (Tex.Civ.App.-Texarkana 1954, writ ref'd n.r.e.). Such negligence may be shown when the parent carelessly fails to restrain a child known to have dangerous tendencies. *Rodriguez,*

902 S.W.2d at 42; *Moody,* 266 S.W.2d at 912. A child is "known to have dangerous tendencies" if the parent can anticipate the danger his child may pose to third parties. *Rodriguez,* 902 S.W.2d at 42. "Actual knowledge is not required if the parent should, under the circumstances, reasonably anticipate the consequences of his or her actions." *Id.* (citing *Way v. Boy Scouts of Am.,* 856 S.W.2d 230, 234 (Tex. App.-Dallas 1993, writ denied)). A parent's duty to protect third parties from the acts of the parent's minor child depends on whether the injury to the third party is foreseeable, as evidenced by the parent's knowledge of, consent to, sanction of, or participation in the child's activities. *Rodriguez,* 902 S.W.2d at 43.

### 3. Cases Interpreting Parental Duty

#### a. Cases Holding Criminal Conduct Not Foreseeable

In *Milligan v. Soto,* 2001 WL 703910, *1 (Tex.App.-Amarillo, not designated for publication), defendant Soto provided day care for plaintiff Milligan's three children. Soto's 14-year-old son, who was mentally retarded, sexually molested two of Milligan's children. The only evidence of foreseeability presented was Soto's son's mental retardation. The court of appeals held that Soto did not owe Milligan a duty because "[t]he evidence affirmatively showed that [Soto's son] did not have disciplinary problems, engage in criminal conduct or sexual activity before, or ever express sexual interest in young children." *Id.* at *3.

In *Childers v. A.S.,* 909 S.W.2d 282, 285 (Tex.App.-Fort Worth 1995, no writ), the Childerses, plaintiffs, filed suit against the parents of A.S., a neighbor child who had forced the Childerses' daughter to participate in sexual "games." The only evidence of foreseeability offered by the Childerses

was that A.S. "had a temper that she lost easily." *Id.* at 288. The Court held that A.S.'s parent's owed no duty to the Childerses or their daughter. *Id.* at 289.

In *Rodriguez v. Spencer*, Paul Broussard was killed by four adults and five minors in a "gay-bashing" incident. 902 S.W.2d at 39–40. Broussard's mother sued Spencer, the mother of one of the minors involved in the murder. *Id.* The Spencers moved for summary judgment, which the trial court granted, contending that they owed no duty to Broussard. *Id.* The summary judgment evidence showed that Spencer's son had average grades in school and was not a discipline problem. *Id.* at 43–44. Prior to the incident, Spencer had never known her son to exhibit violent tendencies. *Id.* On the night of the incident, Spencer's son was supposed to be spending the night with a friend that Spencer knew and trusted. *Id.* This Court held that there was "no reason for [Spencer] to know, or even suspect, that her son might become involved in conduct such as the heinous crime committed against Paul Broussard." *Id.* at 45.

In *Doe v. Franklin*, 930 S.W.2d 921, 922-23 (Tex.App.-El Paso 1996, no writ), a minor sued her grandmother for negligently allowing her to be molested by her grandfather. The grandmother moved for summary judgment, contending she had no duty. The court of appeals held that "[i]t is foreseeable that a child will be victimized if left alone or brought into close proximity with a pedophile" and that "a duty exists to not place a child in a situation in which the risk of sexual abuse is heightened and in which the risk is foreseeable." *Id.* at 928–29. The child presented evidence that she had told her grandmother that her grandfather was abusing her. *Id.* at 923. The grandmother denied such knowledge. *Id.* Because there was a fact question on the issue of

the grandmother's knowledge of the risk posed by the grandfather (i.e., negligence), the court of appeals reversed and remanded. *Id.* at 929.

### b. Cases Holding Criminal Conduct Foreseeable

In *Isbell v. Ryan*, 983 S.W.2d 335, 337 (Tex.App.-Houston [14th Dist.] 1998, no pet.), the plaintiff, Isbell, sued her stepson's mother, Ryan, after the stepson molested Isbell's two young daughters. *Id.* at 337. The stepson had been accused of molesting a cousin the year before Isbell's daughters were molested. *Id.* Child Protective Services told Ryan that there "was reason to believe that [her son] was responsible for the sexual and physical abuse of [the cousin]," but that the agency did not plan to take further action unless it received another report. *Id.* Although Isbell knew about the CPS investigation, she alleged in her petition that Ryan had misled her into believing that CPS had concluded that the allegations against the stepson were groundless. *Id.* Ryan moved for summary judgment, contending that she had no duty to Isbell or her daughters. *Id.* at 338. The trial court granted Ryan's summary judgment. *Id.* The court of appeals reversed, holding that Ryan had a duty to the Isbells because she "could have reasonably anticipated the danger of allowing [her son] to go to the Isbell home without giving the Isbells adequate warning of the possibility of danger to [her son's] half-sisters." *Id.* at 341.

### c. Other Types of Cases Examining Foreseeability of 3rd Party Criminal Conduct.

In *Cain v. Cain*, 870 S.W.2d 676, 678–80 (Tex.App.-Houston [1st Dist.] 1994, writ denied), a minor sued her uncle after she was molested by her uncle's son-in-law, while staying at her uncle's home. On appeal, the uncle argued that the trial court erred by submitting the minor's negligence claim to the jury because he owed

no duty to protect her from torts committed by his son-in-law, a third party. *Id.* at 680. The court of appeals held that the jury charge was properly submitted because the son-in-law's crime was the foreseeable result of the uncle's failure to warn the minor and her mother that another member of his household was a convicted child rapist. *Id.*

In *Golden Spread Council, Inc. v. Akins,* 926 S.W.2d 287, 289 (Tex.1996), a boy scout who was molested by his scoutmaster brought suit against the regional council of the Boy Scouts, alleging that it was negligent in recommending the scoutmaster to the troop. The council filed a motion for summary judgment contending that it owed no duty to the boy. *Id.* at 289. The Supreme Court held that the injury to the boy was foreseeable to the council because it knew that the scoutmaster had been previously accused of " 'messing with' some boy scouts" and that, at the time, the council was concerned that the allegations might be serious. *Id.* at 290. The court held that "if [the council] knew that the scoutmaster was peculiarly likely to molest boys, it had a duty not to recommend him as a scoutmaster." *Id.* at 292.

We note that the scoutmaster's previous behavior of "messing with" some boys, of which the council was aware, is similar to the act of molestation giving rise to that suit. *Id.* at 290. Similarly, in *Cain,* the son-in-law was a convicted child rapist, making his conduct in molesting the defendant's niece foreseeable. 879 S.W.2d 680. Therefore, we note that foreseeability is often determined by whether the defendant is aware of prior, similar behavior by the third party.

### 4. *Did the Herolds Prove As a Matter of Law That Their Son's Conduct was Not Foreseeable?*

In their motion for summary judgment, the Herolds contend they owed no duty because (1) they did not know that Michael had been sexually abused by Melinda, and (2) Michael's actions against J.S. were not foreseeable. In support of their assertions that they neither knew nor should have foreseen that Michael was a danger to others, the Herolds pointed to evidence from their deposition testimony, their affidavits, and the deposition testimony of their children, Michael and Melinda. The Herolds contend that, prior to November 25, 2001, the day after the incident giving rise to this suit, they did not know that Michael had been molested by Melinda. In the Herolds' affidavits and in Beth Herold's deposition testimony, they provided evidence that, prior to the day of the incident, Michael was a member of his high school choir and his church youth group, was doing well in school, had no disciplinary problems, did not use drugs, never had been in trouble with the law, and had never vandalized property. In Melinda and Karen Herolds' depositions, they provided evidence that neither Karen nor Melinda had ever seen pornographic material in their parents' home and had never seen or heard of Michael watching or looking at pornographic material. The Herolds also provided evidence that Michael never had been accused of or suspected of molesting anyone, and they never discovered Michael behind a locked door with another child or sibling.

In their response to the Herolds' motion for summary judgment, the Sanderses introduced the following summary judgment evidence, which they contend raises a fact issue on whether the Herolds knew or should have known that Michael was dangerous: (1) Michael's sister, Melinda, was sexually abused when she was 8 or 9; (2) five years later Melinda exhibited suicidal inclinations that Melinda herself attributed to her earlier abuse; (3) Melinda told nei-

ther parent about the sexual abuse or the suicidal inclinations until forced to do so; (4) Melinda exhibited severe emotional disturbance when she was undergoing professional therapy; (5) Melinda's therapy was abruptly terminated by Melinda without approval of the therapist while Melinda was in the midst of her severely disturbed behavior; (6) at the same time that Melinda had access to Michael without supervision, Michael, who was then a very young child, began to pick the lock on his parents bedroom door on a frequent basis and see his parents in moments of sexual intimacy; (7) Michael's voyeurism was so intense and persistent that his parents could not stop his behavior directly but had to hide in the closet to escape his pursuit of them in intimate moments; (8) as a 16–year–old boy, Michael preferred the company of younger children, including girls the age of 7 and 9, over people his own age; (9) Michael enjoyed pornography in the presence of, and with the encouragement of, his father; (10) Michael was subjected to discussion by his parents of explicit sexual acts and topics; (11) society's growing awareness and concern over child abuse has been judicially noticed as early as 1986, when the Texas Legislature passed legislation for the purpose of insuring the reporting of sexual abuse of children; and (12) that it is commonly known that sexual abuse of one child can start a cycle of child abuse.

The gist of the Sanderses' argument is that the Herolds knew or should have known that Melinda had molested Michael as a child, and that, as a result, the Herolds knew or should have known that Michael would, in turn, molest another child. However, even accepting that sexual abuse may be cyclical in some cases, we will not impose a duty on parents to warn others that their child has been abused. Such a duty would stigmatize all victims of sexual abuse as potential perpetrators of sexual abuse. Instead, there must be some evidence, other than the fact of their child's abuse, available to the parents of the abused child that would make it foreseeable to them to that their child was likely to sexually abuse another.

In this case, the evidence, considered in the light most favorable to the Sanderses as nonmovants is as follows:

(1) Melinda was molested.

(2) Melinda molested Michael when he was a young child, a fact the Herolds did not discover until after Michael was arrested.

(3) At the age of 4 or 5, Michael exhibited voyeuristic tendencies.

(4) As a teenager, Michael enjoyed the company of younger children.

(5) As a teenager, Michael viewed pornography and was raised in a household where sexual topics were frequently discussed in front of the children.

Assuming that the Herolds knew that Michael had been molested as a child, and that sexual abuse can be cyclical, there is nothing in the evidence detailed above to show that the Herold's were aware, or should have been aware, that Michael was likely to continue the cycle of sexual abuse. He was never known to be with another child under inappropriate circumstances. There is nothing in the record to suggest that Michael's voyeuristic tendencies continued past early childhood. Likewise, there is nothing in the record to suggest that Michael's viewing of pornography included viewing child pornography or anything else that would suggest that he had an inappropriate sexual interest in younger children. While the evidence shows that Michael enjoyed the company of younger children, there was no evidence that, prior to the incident giving rise to this lawsuit, Michael's interest in younger chil-

dren was, in any way, sexually inappropriate.

Because there is no evidence that Michael's parents were aware of his "dangerous tendencies" or could "anticipate the danger" he posed to other children, the Heralds had no duty to warn the Sanderses that he was dangerous.[1]

### 5. Can Negative Inferences be Drawn from the Fact that the Herolds' Children Invoked their Fifth Amendment Rights?

 Nevertheless, the Sanderses argue that, because Melinda and Michael asserted their Fifth Amendment rights to various questions posed during their depositions, a negative inference can be drawn that their parents knew Michael had been abused and was abusing J.S. This Court has stated that, after a party has pled the Fifth Amendment, "*if* . . . evidence gives rise to two equally consistent inferences so that neither inference is more probable than the other, neither inference can be made." *Texas Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 780 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (emphasis added); *cf. Baxter v. Palmigiano*, 425 U.S. 308, 318–19, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) (holding that Fifth Amendment does not forbid adverse inferences to evidence offered against one in a civil trial). Although Michael invoked his Fifth Amendment rights to questions about whether his parents knew of his abuse of J.S. prior to November 24, 2001, and although Melinda also invoked her Fifth Amendment rights to similar questions concerning her abuse of Michael, two equally consistent inferences can be drawn: (1) neither Michael nor Melinda wanted to be charged with additional crimes of molestation,[2] or (2) Michael and Melinda sought to protect their parents' knowledge of Michael's abuse and J.S.'s abuse. Contrary to the Sanderses' argument, neither inference is more probable than the other; thus, we cannot draw a negative inference with respect to the Herolds' knowledge from their children's assertion of their own Fifth Amendment privilege. *See Sandefer*, 58 S.W.3d at 780. Therefore, Melinda's and Michael's invocation of their Fifth Amendment rights is no evidence that their parents were aware of Michael's or J.S.'s abuse.

### 6. *Summary*

Based on the evidence showing what the Herolds knew about Michael, or through the exercise of reasonable care should have known, the Herolds could not have reasonably anticipated the danger Michael posed to others. Thus, Michael's actions were not foreseeable to his parents. Under these facts, we hold that the Herolds had no duty to protect J.S. from Michael's actions. *See, e.g. Golden Spread Council, Inc.*, 926 S.W.2d at 292; *Rodriguez*, 902 S.W.2d at 42 n. 5 ("If the reason to anticipate an injury is not established, then no duty arises to prevent the injury."). Accordingly, we overrule appellant's first and third issues.

---

**1.** We note that there can be no duty imposed by a failure to disclose to the Sanderses information about Michael's childhood voyeurism or teenaged viewing of pornography, because the Sanderses were already aware of this information. Indeed, such testimony was provided through the Sanderses' own affidavits. Instead, the Sanderses claim only that the Herolds should have warned them that Michael and Melinda had been victims of sexual abuse.

**2.** There is no indication that Melinda Herold has been charged with any crimes arising out of her molestation of Michael Herold. Michael Herold pleaded guilty to at least one act of an alleged series of molestations against J.S.

## MALICE

In their second issue, the Sanderses contend that the trial court erred in granting summary judgment for the Herolds because they presented sufficient evidence from which it could be reasonably inferred that the Herolds' conduct demonstrated a conscious indifference to an extreme risk so as to defeat the Herolds' motion for summary judgment on the gross negligence claim.

In light of our disposition of issue one, we need not address this issue. Although we agree that gross negligence refers to a different character of conduct, one's conduct cannot be grossly negligent without being negligent. *Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex.App.-Austin 1990, writ denied). We overrule appellant's second issue.

## CONCLUSION

We affirm the judgment of the trial court.